## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In Re:                                                    Case No. 20-41592

The Comet Clothing Company, LLC,                          Chapter 11, Subchapter V

Debtor.

---

### SECOND AMENDED SECOND PLAN OF REORGANIZATION OF THE DEBTOR

---

Dated: March 9, 2021          **FABYANSKE, WESTRA, HART & THOMSON, P.A.**
                              Paul L. Ratelle (#127632)
                              333 South Seventh Street
                              Suite 2600
                              Minneapolis, MN 55402
                              612-359-7600
                              612-359-7602 (f)
                              Email: pratelle@fwhtlaw.com

                              *Attorneys for The Comet Clothing Company LLC, Debtor*
                              *and Debtor in Possession*

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTOR OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

BRIEF HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR ............................ 1

Article 1 DEFINITIONS........................................................................................ 6
    1.1    *Scope of Defined Terms; Rules of Construction.* .............................. 6
    1.2    *Definitions.* .................................................................................... 6
    1.3    *Rules of Interpretation.* ................................................................ 10
    1.4    *Computation of Time.*..................................................................... 10
    1.5    *Reference to Monetary Figures.* ..................................................... 10
    1.6    *Exhibits and Plan Supplement.* ...................................................... 10
    1.7    *Deemed Acts.* ................................................................................ 10

Article 2 ADMINISTRATIVE AND PRIORITY CLAIMS ..................................... 10
    2.1    *Description and Treatment of Allowed Administrative Claims.* ........ 10
    2.2    *Description and Treatment of Allowed Priority Claims.* ................. 11
    2.3    *Administrative Claim Deadline.* ..................................................... 11

Article 3 CLASSES OF OTHER CLAIMS............................................................ 11
    3.1    *Description of Class A1 Claim.* ..................................................... 11
    3.2    *Description of Class A2 Claim.* ..................................................... 11
    3.3    *Description of Class B - Administrative Convenience Class.* ........... 11
    3.4    *Description of Class C Claims.* ..................................................... 11
    3.5    *Description of Class D Interests.* ................................................... 11

Article 4 TREATMENT OF CLASSES OF CLAIMS AND INTERESTS ................ 12
    4.1    *Treatment of the Class A1 Claim.* .................................................. 12
    4.2    *Class A2 Claim.*............................................................................ 12
    4.3    *Treatment of Class B Claims.*........................................................ 13
    4.4    *Class C Claims.*............................................................................ 14
    4.5    *Class D Interests.*.......................................................................... 14
    4.6    *Subordinated Claims and Interests.* .............................................. 14

Article 5 EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................... 13
    5.1    *Assumption or Rejection of Executory Contracts and Unexpired Leases* ......... 14
    5.2    *Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases* ................................................................ 14
    5.3    *Inclusiveness* ................................................................................ 15
    5.4    *Cure of Defaults.* .......................................................................... 15
    5.5    *Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan*................................. 15

i

Article 6 MEANS FOR EXECUTION ............................................................ 166
    6.1    *Operations During the Period Between the Confirmation Date and the Effective Date.* ....................................................................................... 16
    6.2    *Vesting of Property in the Reorganized Debtor.* ................................. 16
    6.3    *Continuing Operations.* ...................................................................... 16
    6.4    *Company Action.* ................................................................................ 16
    6.5    *Working Capital Facility* .................................................................. 166
    6.6    *Issuance of Convertible Preferred Membership Interest.* ................... 167
    6.7    *Continued Organizational Existence of Debtor.* ................................. 19
    6.8    *Post Effective Date Management.* ........................................................ 19
    6.9    *Preservation of Rights of Action; Settlement.* .................................... 19
    6.10   *Cancellation of Existing Security Claims.* .......................................... 21

Article 7 SUPERVISION OF THE PLAN ........................................................ 21
    7.1    *Jurisdiction.* ......................................................................................... 21
    7.2    *General Retention.* .............................................................................. 21
    7.3    *Specific Purposes.* .............................................................................. 21

Article 8 CLAIMS ADMINISTRATION .......................................................... 23
    8.1    *Reservation of Rights to Object to Claims.* .......................................... 23
    8.2    *Filing of Objections.* ........................................................................... 23
    8.3    *Determination of Claims.* .................................................................... 22
    8.4    *Procedures for Contested Claims.* ....................................................... 23

Article 9 PROVISIONS GOVERNING DISTRIBUTIONS     ……………………………………24
    9.1    *Date of Distributions.* .......................................................................... 25
    9.2    *Disbursing Agents.* .............................................................................. 25
    9.3    *Delivery of Distributions* ..................................................................... 25
    9.4    *Unclaimed Distributions.* .................................................................... 26
    9.5    *Manner of Payment.* ............................................................................ 26

Article 10 DISCHARGE, RELEASE AND INJUNCTION .................................... 26
    10.1   *Discharge of Claims and Termination of Interests.* ............................ 26
    10.2   *Releases by Releasing Parties.* ............................................................ 27
    10.3   *Release of Robert Truax.* ..................................................................... 27
    10.3   *Injunction.* ........................................................................................... 27

Article 11 PLAN CONFIRMATION AND EFFECTIVE DATE ............................. 27
    11.1   *Conditions Precedent to Effective Date.* .............................................. 28
    11.2   *Cramdown.* .......................................................................................... 28

Article 12 MISCELLANEOUS ....................................................................... 29
    12.1   *Time of the Essence.* ............................................................................ 29
    12.2   *Retention of Claims and Rights of Action.* .......................................... 29
    12.3   *Amendments or Modifications of the Plan.* .......................................... 29
    12.4   *Exhibits/Schedules. .* ............................................................................ 29
    12.5   *Event of Default.* ................................................................................. 29

## INTRODUCTION

The Comet Clothing Company LLC, the above-captioned debtor and debtor in possession proposes this first amended second chapter 11 plan of reorganization. The Plan constitutes a chapter 11 plan for the Debtor for the resolution of outstanding Claims against and Interests in the Debtor pursuant to the Bankruptcy Code. The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THIS PLAN ARE ENCOURAGED TO READ THIS PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## BRIEF HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### I.      Current Business Plans

The Debtor owns the Zubaz brand and associated trademarks and copyrights.

Owing to its prominent lineage during the late 1980s and early 90s, Zubaz is one of the most recognizable brands in the licensed sports merchandise industry. Following a long absence from retail, the famous sports-centric attire returned in 2007 with a renewed purpose that is attracting a unique and desirable cross-section of consumers. To those who grew up with the brand or wore its products in the early days, Zubaz provides a sense of nostalgia. To the sports teams and athletes of the influential millennial generation, the Zubaz brand engenders a certain camaraderie, a sense of belonging, and in some cases individualism.

Today, the Zubaz brand extends over three main areas of concentration. First, its sports licensing division with the NFL, Dallas Cowboys and key college partnerships. Second, the Debtor is reintroducing its branded business and has hired a key designer in the industry, Maade Sediki. Maade has worked with brands such as Champion, Reebok, Saucony and Brooks. In addition to working with Maade, the Debtor will be partnering with an expert creative and digital marketing group that specializes in connecting brands with their core customers in the online format.  The Debtor intends to launch with one or two key retailers. This shift in focus allows the Debtor to capture the direct to consumer customer which brings a great increase in margins and profitability. Lastly, the Debtor intends to focus on its non-traditional sports business utilizing its license with World Wrestling Entertainment, Inc. and key partnerships in E-Sports.

In addition to the expanded product line, the Debtor is actively pursuing licensing opportunities with its intellectual property.  The Debtor has recently signed two major deals, with Adidas and 47 Brand. Adidas is launching a Zubaz/Adidas co- branded line with their football division which includes cross training shoes, football cleats, gloves and training apparel. This launch will occur with the Pro Bowl in 2021 and the Miami Hurricanes Spring Game in March 2021.  The product line will be offered to every NFL player signed with Adidas and all colleges and high schools that they work with.

The 47 Brand partnership allows the Debtor to maximize profitability with its intellectual property in the headwear area. 47 Brand will produce a co-branded headwear line for the NFL, NBA, MLB, NHL and key colleges using the Debtor's famous zebra stripes and branding.

1

## II.       The Debtor's Involvement with Fanatics, Inc. and Fanatics Retail Group (Dreams), LLC[1]

In 2010, Dreams, Inc. ("Dreams") purchased 51 percent of the outstanding membership interest in the Debtor pursuant to a Membership Unit Purchase Agreement dated September 1, 2010 (the "Purchase Agreement"). Among other terms and conditions set forth in this Purchase Agreement, Dreams agreed that "in consideration for [the Debtor's] issuance of [135,619 Membership Units in the Debtor], [Dreams] has agreed to provide certain working capital to [the Debtor] and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties (the 'Purchase Price')."

In 2012, Fanatics, Inc. ("Fanatics") purchased Dreams. Following Fanatics' acquisition of Dreams, Fanatics changed the name of Dreams to Fanatics Retail Group (Dreams), LLC ("FRG") and also converted FRG from a corporation to a limited liability company. FRG is a wholly owned subsidiary of Fanatics and, until February 2019, Fanatics maintained a 51% ownership interest in the Debtor through its wholly owned subsidiary, FRG.

From 2012 until the date of the Redemption Agreement, referred to below, FRG maintained its 51% ownership interest in the Debtor and controlled the Debtor including, without limitation, (i) all of the revenue generated by the Debtor from the Debtor's sales of goods and (ii) the financial books and records of the Debtor. During this time, FRG prepared periodic financial reports of the operations of the Debtor, but failed to provide the Debtor's chief executive officer, Robert Truax, any backup detail to confirm the accuracy of the financial statement/reports of the Debtor prepared by Fanatics.

Intermittently through February of 2019, when FRG transferred to the Debtor FRG's 51% membership interest in the Debtor, FRG performed Dreams' undertaking in the Purchase Agreement to provide working capital to the Debtor. At no time while FRG provided working capital contributions to the Debtor were these contributions considered loans, as evidenced by, among other facts and circumstances: a) FRG did not request that the Debtor execute (and the Debtor did not execute) any promissory notes or other instrument evidencing that the working capital contributions by FRG to the Debtor was debt rather than equity; b) FRG did not demand repayment from the Debtor of these contributions; c) these contributions were used by the Debtor as working capital; d) there was no fixed maturity date for the repayment of these contribution; e) these contributions were made over a period of years with no interest rate established between the Debtor and FRG relative to the repayment of these contribution; f) there was no certainty of repayment of the contributions in the event of liquidation or insolvency of the Debtor, and g) FRG made these contributions under the Purchase Agreement pursuant to which these contributions are not defined or characterized as loans or debt. Notwithstanding the forgoing, FRG claimed these

---

[1]This and subsequent sections of the Plan contain certain factual allegations by the Debtor regarding its relationship with FRG and Fanatics. FRG and Fanatics deny many of these allegations, all of which are being resolved by the comprehensive settlement between the Debtor, FRG and Fanatics set forth in this Plan. By withdrawing its objection and agreeing to the treatment in this Plan, neither FRG nor Fanatics shall be deemed to agree with any of the allegations contained in this section or elsewhere in the Plan including, without limitation, any factual statements concerning FRG and Fanatics.

2

contributions to be "loans" or debt rather than equity and, consequently, asserted that the unpaid balance of these "loans" as of the date of the Redemption Agreement, referred to below, was approximately $6,600,000.

In a proposal letter dated June 7, 2018 from FRG to the Debtor, which the Debtor accepted, FRG offered various non-binding terms including a proposal that the Debtor purchase from FRG its 51% ownership interest in the Debtor in exchange for "the forgiveness of all outstanding amounts owed to [FRG] by the [Debtor] in exchange for a secured promissory note . . . issued by the [Debtor] in favor of [FRG] for an aggregate principal amount equal to the value of the [Debtor's] saleable inventory as of the closing date which value presently approximates $3,600,000."

Between July of 2018 and February of 2019, FRG and Fanatics preferentially paid themselves approximately $1,900,000 from the Debtor's 2018 sales revenue and, by doing so, left unpaid a number of critical trade creditors of the Debtor, including an important inventory supplier, Jiangsu GTIG Esen ("GTIG"), to which the Debtor owed $833,203.16 as of the date of the Redemption Agreement, referred to below. When it controlled the Debtor's revenue, FRG failed to pay GTIG and in consequence of which GTIG cancelled the Debtor's orders for inventory the Debtor had placed with GTIG during the last quarter of 2018 to fill the Debtor's purchase orders from its customers. Due to the cancellation of its purchase orders with GTIG, the Debtor's customers, in turn, cancelled their purchase orders with the Debtor due to non-delivery. These cancelled orders, as FRG knew or had reason to know, would occur due to the preferential payments to repay FRG's working capital contributions to Debtor over payments to the Debtor's trade creditors and, in turn, would cause substantial losses to the Debtor in 2019 and contribute to the Debtor's inability to pay the Note, described below, when it matured in November of 2019.

On February 1, 2019, FRG and the Debtor executed a Loan Modification and Membership Interest Redemption Agreement (the "Redemption Agreement").

Pursuant to the terms of the Redemption Agreement, FRG agreed, among other things: (a) to forgive the entire balance of the $6,600,000 loan FRG claimed was due from the Debtor; and (b) to transfer to the Debtor FRG's 51% ownership interest in the Debtor in redemption thereof. In addition, under Section 2 of the Redemption Agreement: "Subsequent to the effectiveness of the debt forgiveness under Section 1 hereof and in exchange for the Redemption Consideration, (i) the Seller hereby sells, conveys, assigns, transfers, delivers, and vests in the Company all of the Seller's right, title and interest in and to the Seller Membership Interests on the terms and conditions set forth in this Agreement, and (ii) the Company hereby redeems, acquires and accepts from the Seller, all of the Seller Membership Interests."

The Redemption Consideration is evidenced by a Secured Promissory Note dated as of February 1, 2019 in the principal sum of $2,230,027.77 which the Debtor executed in connection with the Redemption Agreement (the "Note"). In addition to the Note, the Debtor executed a Security and Guaranty Agreement dated as of February 1, 2019 (the "SGA"). Pursuant to the SGA, the Debtor granted FRG a security interest in the Debtor's assets as described in the SGA.

3

The Debtor and Fanatics are parties to an Apparel Sub-Manufacturing, Distribution and Sale Agreement, dated as of January 1, 2019 (the "Apparel Agreement").  Under this Apparel Agreement, the Debtor sells major league baseball licensed sportswear.

By September of 2019, Fanatics ceased reordering product from the Debtor, contrary to its prior ordinary course of dealing with the Debtor.  Prior to September of 2019, Fanatics would ordinarily reorder from the Debtor thousands of units of goods from the Debtor for the platforms Fanatics controlled including, for example, Fanatics.com. Based upon Fanatics' prior course of dealing with the Debtor, the departure from which Fanatics failed to disclose to the Debtor, the Debtor ordered thousands of dollars of goods in anticipation of these reorders and, due to Fanatics' failure to reorder these goods, left the Debtor with an oversupply of inventory with no purchaser, which, in turn, caused financial losses to the Debtor which contributed to, as FRG and Fanatics expected, the Debtor's inability to pay the Note, described below, when it matured in November of 2019.

By September of 2019, Fanatics had converted thousands of dollars of payments payable to the Debtor for the Debtor's sale of goods to third parties and withheld from the Debtor hundreds of thousands of dollars owed by Fanatics for goods the Debtor had sold to Fanatics.  These actions by FRG and Fanatics contributed, as they expected, to the Debtor's inability to pay the Note when it matured in November of 2019.  On September 5, 2019, knowing the actions described above would contribute to the Debtor's inability to pay the Note when it matured in November of 2019, Fanatics, through Vicky Picca, Fanatics' Senior Vice President of Business Affairs and a senior member of Fanatics' business team, proposed to extend the maturity date of the Note to May 1, 2019 provided, among other things, that the Debtor and "and [Fanatics] enter into a vendor exclusivity agreement effective immediately (i.e., as of 9/5/19) pursuant to which [the Debtor] grants [Fanatics] exclusive Pure Play distribution rights for sports licensed products."  The Debtor declined to enter into this exclusivity arrangement with Fanatics and, accordingly, Fanatics and FRG did not extend the maturity date of the Note.

The Note matured on November 1, 2019 (the "Maturity Date") and, as FRG and Fanatics well knew based upon their actions through this date, the Debtor could not pay the Note in full.

Between January of 2020 and May of 2020, while appearing to entertain offers from the Debtor to restructure the terms of the Note, FRG and Fanatics ultimately rejected all such offers. In April of 2020, FRG requested that the Debtor provide FRG a copy of the Debtor's current report of booked sales orders.  On April 28, 2020, the Debtor provided to FRG the Debtor's 2020 booked sales order report as of April 28, 2020. This report disclosed that the Debtor had, as of that date, retained over $840,000 worth of sales of MLB licensed sportswear notwithstanding the economic shutdown due to COVID-19 and the uncertainty of the commencement of the 2020 major league baseball season.  One day after receiving this report, Fanatics sent to the Debtor a letter purporting to terminate the Apparel Agreement. This letter made assertions that were factually incorrect and not in conformity to the terms and conditions of the Apparel Agreement.

The Debtor believes that Fanatics attempted to terminate the Apparel Agreement to disrupt the Debtor's sales of MLB licensed sportswear and, by doing so, to force the Debtor out of business.  Upon information and belief, this plan of FRG and Fanatics to force the Debtor out of business is evidenced, in part, by their offer in June 3, 2020, pursuant to which, among other terms

4

and conditions, FRG and Fanatics agreed to accept in full satisfaction of the Note the Debtor's transfer, conveyance and delivery to FRG of all of the Debtor's assets including those assets subject to FRG's security interest under the SGA. The Debtor rejected this offer and, subsequently, filed its voluntary petition or relief pursuant to Chapter 11, Small Business Reorganization Act of 2019, Subchapter V of Title 11 of the United States Bankruptcy Code.

## III.      Debtor's Current Operations

Notwithstanding the decision of state and local governments to shut down economic activity for a substantial part of this year due to COVID-19, the Debtor has nevertheless maintained a significant number of commitments from its customers to purchase sports apparel and related clothing articles from the Debtor. The Debtor's customers include such companies as Amazon.com, Inc., HSN, Inc., Walmart, Inc., and Meijer, Inc.

Since the Petition Date through the week beginning on November 30, 2020, the Debtor sold $4,989,589 of goods while collecting on its sales prior to and after the Petition Date in excess of $3,775,000 and held inventory of $1,261,654, accounts receivable of $1,429,360 and cash of $641,021. The Debtor has remained current on its ongoing operating expenses since the Petition Date. In addition, the Debtor's assets comprised of inventory, accounts receivable and cash have increased in value from $2,717,471 at the end of the week of June 15, 2020 to $3,332,035 by the end of the week of November 30, 2020.

Although COVID-19 has strained production supply lines across the globe and, therefore, has impacted the delivery of inventory purchased by the Debtor to fill its orders with its customers, the customers extended the delivery dates of their orders with the Debtor and, therefore, the Debtor completed sales for the month of October 2020 of approximately $2,118,897, the highest monthly dollar volume of sales in the history of the Debtor.

## IV.      Litigation with FRG and Fanatics

The Debtor is involved in two pending adversary proceedings, one with Fanatics and the other with FRG and Fanatics.

In the proceeding between Fanatics and the Debtor, Fanatics has asserted that it terminated the Apparel Agreement. The Debtor has denied that the Apparel Agreement is terminated and has denied Fanatics' claims. In the case involving both FRG and Fanatics, the Debtor has asserted claims against them seeking, among other relief, the subordination of their claims against the Debtor, the avoidance of any lien asserted by FRG against the assets of the Debtor and the disallowance of their respective claims against the Debtor and its estate. FRG and Fanatics dispute the claims asserted by the Debtor against them.

## V.      The Debtor's Future

The Debtor has attached the following documents in an effort to provide information regarding the value of its assets, its finances in the recent past and its likely finances going forward:

**Exhibit A**: Historic Financial Information and Projected Future Forecast
**Exhibit B**: Liquidation Analysis

**Exhibit C**: Summary of Assets
**Exhibit D**: Equity Interests
**Exhibit E**: Executory Contracts and Unexpired Leases
**Exhibit F**: Projection Variance Analysis

# ARTICLE 1
# DEFINITIONS

1.1    *Scope of Defined Terms; Rules of Construction.*  For purposes of this Plan, except as expressly defined elsewhere in the Plan or unless the context otherwise requires, all capitalized terms used herein shall have the meanings ascribed to them in this Article I of this Plan. Any term used but not defined herein that is defined in the Bankruptcy Code or the Bankruptcy Rules, as the case may be, shall have the meaning ascribed in the Bankruptcy Code or the Bankruptcy Rules. Whenever the context requires, such terms shall include the plural as well as the singular. The masculine gender shall include the feminine, and the feminine gender shall include the masculine.

1.2    *Definitions.    The following words and phrases when used herein have the following meanings:*

"Administrative Claim" means any Claim for payment of an administrative expense of a kind specified in section 503(b) of the Code and entitled to priority pursuant to section 507(a)(2) of the Code.

"Allowed" means, with respect to any claim, (i) a claim that has been scheduled by one or more of the Debtor as other than disputed, contingent, or unliquidated, and as to which one or more of the Debtor or any other party-in-interest has not filed an objection; (ii) a claim that has been allowed by a Final Order; (iii) a claim that is allowed in a court-approved stipulation or settlement; or (iv) a claim as to which a proof of claim has been timely filed and as to which the Debtor, or any party-in-interest, have not filed an objection; and with respect to all claims, only after reduction for applicable setoff and similar rights of the Debtor.

"Allowed Administrative Claim" means any Allowed Claim that is also an Administrative Claim.

"Allowed Claim" means any portion of a Claim that is Allowed.

"Allowed Interest" means any portion of an Interest that is an Allowed.

"Allowed Priority Claim" means an Allowed Claim that is entitled to priority under Sections 507of the Code.

"Avoidance Actions" means any and all actual or potential claims or Causes of Action to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a).

6

"Bankruptcy Code" or "Code" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, and, where applicable, the Federal Rules of Bankruptcy Procedure.

"Bankruptcy Court" or "Court" means the United States Bankruptcy Court of the District of Minnesota.

"Cash" means legal currency of the United States of America or equivalents thereof, including bank deposits and checks.

"Cause of Action" means any and all actions, proceedings, causes of action (including, without limitation, any causes of action of a debtor or debtor in possession under chapter 5 of the Bankruptcy Code such as the Avoidance Claims or turnover actions), liabilities, obligations, suits, reckonings, covenants, contracts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, rights to object to claims, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured or whether asserted or assertable directly or derivatively, in law, equity or otherwise, and all rights thereunder or attendant thereto that belong to one or more of the Debtor or one or more of the bankruptcy estates.

"Chapter 11 Case" means the SubChapter V, Chapter 11 Case of the Debtor.

"Claim" means a claim against Debtor, whether asserted or Allowed, as defined in section 101(5) of the Code.

"Confirmation Date" means the date on which the Confirmation Order is entered by the Court.

"Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to Bankruptcy Code section 1129, as such hearing may be continued from time to time.

"Confirmation Order" means the order entered by the Court confirming the Plan pursuant to Section 1191 of the Code, in form and substance agreeable to Fanatics and FRG.

"Contested Claim" or "contested claim" means (i) a claim that is not an Allowed claim because one or more of the Debtor, or another party in interest has objected to allowance of such claim under Section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007; (ii) any secured or unsecured portions of a Secured Claim that is the subject of a motion for determination of the value of security under Section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012; (iii) any claim held by a creditor against which one or more of the Debtor has demanded the recovery of property pursuant to Section 502(d) of the Bankruptcy Code, without regard to whether such claim was previously an Allowed claim; or (iv) a claim whose validity or amount is subject to determination in an adversary proceeding that has not been resolved by a Final Order.

7

"Cure Costs" means the costs required of a Debtor to cure any and all defaults, pursuant to Bankruptcy Code section 365, of the Debtor arising under any executory contract to which the Debtor is a party or successor in interest, or any unexpired lease to which the Debtor is a party or successor in interest.

"Cure Notice" means any notice that sets forth the proposed Cure Costs under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor under the Plan, which notice shall include (a) procedures for objecting to proposed assumptions or assignments of the applicable Executory Contracts and/or Unexpired Leases, (b) the Cure Costs proposed to be paid in connection therewith, and (c) procedures for resolution by the Court of any related dispute.

"Debtor" shall refer to The Comet Clothing Company LLC.

"Discharge Date" means a date as soon as practicable after completion by the Debtor of all payments due within three (3) years of the Plan.

"Disposable Income" means "disposable income" as defined under Section 1191(d) of the Code; provided, however, that income is to be determined on an after tax basis and "expenditures for the continuation, preservation or operation of the business" of the Reorganized Debtor under Section 1191(d)(2) of the Code including, as expenditures for the continuation, preservation or operation of the business, without limitation, payments on account of Allowed Class A1 Claim, Allowed Class A2 Claim and Allowed Class B Claims as well as a reserve to pay expenses of operations in the months when the Reorganized Debtor's sales revenue are not sufficient to fund operating expenses.

"Disputed Claim" means any portion of any Claim (i) which has been scheduled with the Court as disputed, contingent, or unliquidated, or (ii) proof of which has been filed with the Court and to the allowance of which an objection has been filed within the time limitations fixed by the Code, this Plan, or an order of the Court, and as to the allowability of which no determination has been made by Final Order of the Court.

"Effective Date" means the first business day after the conditions precedent stated in Section 9.1 are satisfied.

"Entity" has the meaning set forth in Section 101(15) of the Bankruptcy Code.

"Executory Contract" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

"Fanatics" means, collectively or individually, Fanatics, Inc. and its predecessors, successors and assigns.

"File," "Filed," and "Filing" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court.

"Final Order" means an order of the Court or the Federal District Court as to which (a) any appeal which has been taken has been finally determined or dismissed or (b) the time for appeal has expired and no appeal has been timely filed.

"Final Determination" means a determination under non-bankruptcy law that has not been stayed, reversed, or amended and to which (i) the time to appeal or seek review or rehearing has expired, and (ii) no appeal or petition for review or rehearing was filed or, if it has been filed, it remains pending.

"FRG" means, collectively or individually, Fanatics Retail Group (Dreams), LLC, a Delaware limited liability company, and its predecessors, successors and assigns.

"Holder" means an Entity holding a Claim or Interest, as applicable.

"Impaired" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Bankruptcy Code section 1124.

"Interest" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in the Debtor, including options, warrants, rights, limited liability company interests, or other equity, ownership or profits interests of the Debtor (whether or not arising under or in connection with any employment agreement, separation agreement or employee incentive plan or program of a Debtor as of the Petition Date).

"Lien" means a charge against or interest in property to secure payment of a debt or performance of an obligation.

"Local Rules" means the Local Rules of the Court.

"Petition Date" means June 12, 2020, the day that the Debtor filed its voluntary petition for relief pursuant to Chapter 11, Small Business Reorganization Act of 2019, Subchapter V of Title 11 of the United States Code.

"Plan" means this Fist Amended Second Amended Plan of Reorganization.

"Priority Claims" means Claims that are entitled to priority payment under § 507 of the Code.

"Record Date" means the last date on which a claim transfer will be recognized. The Record Date is the Confirmation Date.

"Reorganized Debtor" shall refer to the Debtor, as reorganized pursuant to and under the Plan, on or after the Effective Date, or any successor or assign thereto.

"Secured Claim" means any allowed claim that is determined to be secured pursuant to Section 506 of the Bankruptcy Code.

"Sub V Trustee" means the Subchapter V trustee in Chapter 11 Case, Mary Sieling, or her successor.

"Unexpired Lease" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.3   *Rules of Interpretation.*  For purposes of the Plan, (i) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (ii) any reference in the Plan to an existing document or exhibit Filed or to be Filed means such document or exhibit as it may have been or may be amended, modified, or supplemented as permitted herein; (iii) unless otherwise specified, all references in the Plan to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules, and Exhibits of or to the Plan; (iv) the words "herein," "hereto," and "hereof" refer to the Plan in its entirety rather than to a particular portion of the Plan; (v) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (vi) the rules of construction set forth in Bankruptcy Code section 102 and in the Bankruptcy Rules shall apply.

1.4   *Computation of Time.*  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.5   *Reference to Monetary Figures.*  All references in the Plan to monetary figures shall refer to legal currency of the United States of America, unless otherwise expressly provided.

1.6   *Exhibits and Plan Supplement*.  All exhibits, if any, are incorporated into and are a part of the Plan as if set forth in full herein. Holders of Claims and Interests may obtain a copy of any filed exhibits upon written request to any of the Plan Proponents. Plan Proponents explicitly reserve the right to modify or make additions to or subtractions from any exhibit or to the Plan and to amend, modify or supplement any exhibit to the Plan prior to the Confirmation Date.

1.7   *Deemed Acts*.  Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

## ARTICLE 2
## ADMINISTRATIVE AND PRIORITY CLAIMS

2.1   *Description and Treatment of Allowed Administrative Claims*.  The Debtor will pay each holder of an Allowed Administrative Claim the full amount of such Allowed Administrative Claim (a) in Cash on the later of (i) the Effective Date, or (ii) as soon as practicable after the Administrative Claim becomes an Allowed Administrative Claim; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 cases have been (and will continue to be) paid in the ordinary course of business in accordance with their terms.

10

2.2   *Description and Treatment of Allowed Priority Claims.*  Allowed Priority Claims payable outside the ordinary course of business, if any, will be paid in full in Cash on the Effective Date, or as soon as practicable thereafter, or shall be paid in accordance with such terms as may have been or may be agreed upon by Debtor and the respective claimants.

The Debtor will pay all post-petition taxes in the ordinary course of business as they come due.

2.3   *Administrative Claim Deadline.*  Requests for payment of Administrative Claims must be filed and served no later than thirty (30) days after entry of the Confirmation Order ("Administrative Claims Deadline") in accordance with Local Rules 2016-1(b) or 3002-2, as applicable.   Administrative Claims holders that do not file a request for payment by the Administrative Claims Deadline will be forever barred from asserting such claims against the Debtor or the Reorganized Debtor or any of their property.  The Administrative Claims Deadline can only be extended by order of the Bankruptcy Court.

## ARTICLE 3
## CLASSES OF OTHER CLAIMS

3.1   *Description of Class A1 Claim.*  The Class A1 Claim shall consist of the Allowed Secured Claim held by North Mill Capital, LLC ("NMC") against the Debtor. The principal amount of the claim, as of January 15, 2021, is expected to total $0.00.  In addition, pursuant to the Stipulated Final Order Authorizing Debtor to Use of Cash Collateral, to Incur Secured Postpetition Debt and Other Relief ("DIP Order") [ECF 75], NMC is entitled, to the extent provided and allowed by §506 of the Bankruptcy Code, interest at rates set forth in the Loan Documents (as defined in the DIP Order) and reasonable attorneys' fees as well as all other reasonable costs and expenses incurred by NMC as more fully set forth in the DIP Order and Loan Documents.

3.2   *Description of Class A2 Claim.*  The Class A2 Claim will consist of the Secured Claim held by FRG, which shall be allowed in the amount of $2.8 million (the "Allowed Class A2 Claim").

3.3   *Description of Class B - Administrative Convenience Class.*  The Class B Claims will consist of all Allowed Unsecured Claims against the Debtor that are (a) scheduled in the amount of $250 or less, or (b) reduced by the holder of the Claim to $250 to be treated under this class through an election on a ballot cast pursuant to the Plan.

3.4   *Description of Class C Claims.*  The Class C Claims will consist of all Allowed Unsecured Claims against the Debtor that are not included in any other class of Claims, including any Unsecured Claim held by a secured creditor of the Debtor arising from the determination of its Allowed Secured Claim under § 506 of the Code or otherwise.

3.5   *Description of Class D Interests.*  The Class D Interests will consist of all rights attributable to the holders of membership interests in the Debtor, together with all options, warrants, or other rights, commitments, or agreements of any nature, if any, to acquire any membership interest in the Debtor.

11

## ARTICLE 4
## TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

4.1   *Class A1 Claim.*

*Treatment*:       As the Holder of the Class A1 Allowed Secured Claim, NMC shall receive, in full and final satisfaction of this Allowed Secured Claim, payment in full of this Allowed Secured Claim on the Effective Date or otherwise in the ordinary course of the Reorganized Debtor's business.

*Voting:*       Class A1 is Unimpaired. NMC, as the Holder of the Class A1 Allowed Secured Claim, is conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. NMC, as the Holder of Class A1 Allowed Secured Claim is not entitled to vote to accept or reject the Plan.

4.2   *Class A2 Claim.*

*Treatment:*       In full and final satisfaction of the Allowed Class A2 Claim, by the Effective Date, the Reorganized Debtor will execute (1) a secured promissory note, substantially in the form of **Exhibit A** attached hereto (the "**New Fanatics' Note**"), in the principal amount of $2,500,000 (the "**Principal Amount**") plus $300,000 of fees, costs and interest the Debtor and FRG agree are allowable under  § 506(b) of the Bankruptcy Code (the "**Additional Amount**") and (2) a security and guaranty agreement in favor of Fanatics, or its designee, in form and substance reasonably agreeable to FRG and the Reorganized Debtor (the "**New Fanatics' Security Agreement**").  The terms of the New Fanatics' Note will include, among other terms, the following repayment terms: the Reorganized Debtor makes a payment to FRG under the New Fanatics' Note of the Principal Amount of $300,000 on the Effective Date and will make monthly payments of principal in the amount of $26,191.00 by the fifth business day of the month immediately following the Effective Date and continuing on the fifth business day of each month thereafter until the second anniversary date of the New Fanatics' Note at which time the entire unpaid Principal Amount, the Additional Amount and interest accruing thereon at the annual rate of 9% per annum shall be due and payable in full.

The New Fanatics' Note includes covenants by the Reorganized Debtor in favor of FRG set forth in the New Fanatics' Note (the "**Covenants**"), **Exhibit A** hereto.

Among the remedies for any default by the Reorganized Debtor under the New Fanatics' Note, FRG may apply to the Court for an order converting this chapter 11 case to a case under chapter 7 of the Bankruptcy Code (the "**Application to Convert**"), so long as FRG shall have first provided fifteen (15) days' written notice thereof (the "**Noticed Default**") to the Reorganized Debtor.  The Reorganized Debtor's only defenses to the Application to Convert shall be that (i) the Noticed Default is not a default under the New Fanatics' Note or (ii) the Noticed Default has been cured within the 15-day notice period.

Under New Fanatics' Security Agreement, the obligations of the Reorganized Debtor under the New Fanatics' Note will be personally guaranteed by Robert Truax, the chief executive officer of the Reorganized Debtor.  In exchange for his personal guaranty, FRG will release Robert Truax

12

from any and all claims asserted by FRG against Robert Truax under his personal guaranty of the Debtor's obligations under the Note in FRG's Complaint filed with the United States District Court for the District of Delaware, *Fanatics Retail Group (Dreams), LLC v. Robert Truax*, Court Action No. 20-cv-00794-MN (the "**Guaranty Litigation**") and dismiss with prejudice the Guaranty Litigation. In addition, FRG and Fanatics agree to withdraw its pending motion to convert the Debtor's Chapter 11 case to Chapter 7 (ECF No. 30).

Also under the New Fanatics' Security Agreement, the Reorganized Debtor will grant a security interest to FRG in the many of the same assets that will secure the working capital lender under the New Facility. FRG will agree to subordinate its security interest in certain of these assets to the security interest of Franklin Capital Holdings LLC ("**FCH**") in these assets pursuant to the terms of the subordination agreement substantially in the form attached hereto as **Exhibit B** (the "**Subordination Agreement**"). Among other things, the Subordination Agreement provides that FRG shall be subordinated no more than $1.8 million under the FCH facility during the months of May through October and no more than $1.0 million under the FCH facility advanced during the months of November through April, on terms as set forth in the Subordination Agreement. The security interest granted by the Reorganized Debtor to the working capital lender will not include the Reorganized Debtor's intellectual property. The security interest granted by the Reorganized Debtor to FRG under the New Fanatic's Security Agreement will include the Reorganized Debtor's intellectual property.

The Class A2 Claim has been challenged by the Debtor in an adversary proceeding, Adv. No. 20-4118, pending before the Court (the "**Comet Adversary Proceeding**"). In addition, Fanatics has commenced an adversary proceeding against the Debtor pending before the Court (the "**Fanatics' Adversary Proceeding**") concerning a confidential Apparel Sub-Manufacturing, Distribution and Sale Agreement between the Debtor and Fanatics. Upon entry of the Confirmation Order, Fanatics, FRG and the Debtor file with the Court stipulations of dismissal in the Comet Adversary Proceeding and the Fanatics' Adversary Proceeding (collectively, the "**Adversary Proceedings**") dismissing with prejudice the claims asserted therein.

The full execution of the New Fanatics' Note and the New Fanatics' Security Agreement by FRG, the Reorganized Debtor and Robert Truax, the execution of the Subordination Agreement by FRG and FCH, FRG's release Robert Truax and dismissal of the Guaranty Litigation, the dismissal of the Adversary Proceedings and FRG and Fanatics' withdrawal of their motion to convert shall be conditions precedent to the Effective Date.

*Voting*: The Class A2 Claim is Impaired. The Holder of an Allowed Class A2 Claim shall be entitled to vote to accept or reject the Plan.

4.3 *Treatment of Class B Claims.*

*Treatment.* Allowed Class B Claims shall be paid 100% in Cash without interest on the later of 30 days after the Effective Date or 30 days after the Class B Claim is Allowed by Final Order.

*Voting:* Class B Claims are Impaired. Each Holder of an Allowed Class B Claim shall be entitled to vote to accept or reject the Plan.

4.4   *Class C Claims.*

*Treatment*:      In full satisfaction of their unsecured claims, the Holders of Allowed Class C Claims will receive their pro rata share of the Debtor's Disposable Income from the Effective Date through the earlier of (a) payment in full without interest of all Allowed Class C Claims or (b) the third anniversary of the Effective Date.

*Voting:*      Class C Claims are Impaired. Each Holder of an Allowed Class C Claim shall be entitled to vote to accept or reject the Plan.

4.5   *Class D Interests.*

*Treatment:*      Each Holder of an Allowed Class D Interest, other than Robert Truax, shall receive his/hers/its membership interest in the Reorganized Debtor diluted, collectively, to a pro rata share of 5% of the outstanding membership interests in the Reorganized Debtor after taking into account the Capital Contribution (defined below) and the Reorganized Debtor's issuance of the Preferred Interest (as defined below), subject to the rights of the holder(s) of Preferred Interest and Robert Truax's 45% non-preferred membership interest in the Reorganized Debtor and the Debtor's September 2, 2010 Operating and Member Control Agreement, which in its entirety shall be deemed to have been adopted and ratified by the Reorganized Debtor and its members as of the Effective Date as the Operating and Member Control Agreement of the Reorganized Debtor and its members, except as modified and amended to take into account the rights of the Investor (as defined below) and Robert Truax, as described in Sections 6.6 and 6.8 below, and after taking into account the Capital Contribution of the Investor (defined below) and such other provisions as may be required by the Investor and acceptable to the members (the "**Assumed Operating Agreement**").

*Voting:*      Class D Interests are impaired.  Each Holder of Allowed Class D Interests shall be entitled to vote to accept or reject the Plan.

4.6   *Subordinated Claims and Interests*.  The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account the relative priority and rights of the Claims and Interests in each Class; provided, however, that notwithstanding the foregoing, the Debtor or Reorganized Debtor, as applicable, reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable or mandatory subordination relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.

## ARTICLE 5
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1   *Assumption or Rejection of Executory Contracts and Unexpired Leases*.  Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Person or Entity shall be deemed assumed by the Debtor as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court entered on or before the Effective Date, (ii) as to which a motion for approval of the assumption,

14

assumption and assignment, or rejection has been filed and served prior to the Confirmation Date, or (iii) that is specifically designated as a contract or lease to be rejected on a schedule filed with the Bankruptcy Court prior to or at the Confirmation Hearing; in which event such scheduled executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, rejected as of the Effective Date. The Debtor shall provide notice of the filing of such schedule to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on any such filed schedule shall not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder.

5.2    *Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases*.  Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases except those listed on any schedule of rejected executor contracts or unexpired leases timely filed with the Bankruptcy Court.

5.3    *Inclusiveness.*  Unless otherwise specified, each executory contract and unexpired lease assumed pursuant hereto shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease.

5.4    *Cure of Defaults*.  Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease that is being assumed under the Plan, the Debtor shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, at least 20 days prior to the Confirmation hearing, file with the Bankruptcy Court and serve by first class mail on each non-debtor party to such executory contracts or unexpired leases, a notice (the "Assumption Notice"), which shall list the cure amount as to each executory contract or unexpired lease to be assumed, and state the period over which the Debtor shall pay such cure amount. If there are any objections filed, the Bankruptcy Court may either schedule such objection to be heard at the Confirmation Hearing or at a later hearing on a date to be set by the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan, the Debtor, shall retain its rights to reject any of the executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

5.5    *Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan*.  In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, or its properties or interest in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon the attorneys for the Debtor on or before the thirtieth (30th) day after the later of (i) the date of service of notice of the Effective Date, or (ii) the date of service of notice of such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults (solely with respect to the party directly affected by such modification).

## ARTICLE 6
## MEANS FOR EXECUTION

6.1  *Operations During the Period Between the Confirmation Date and the Effective Date.*  During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to operate its businesses as a Debtor in Possession, subject to the supervision of the Bankruptcy Court in compliance with the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

6.2  *Vesting of Property in the Reorganized Debto*r.  On the Effective Date, except as otherwise provided in this Plan, title to all of the Debtor's property and assets shall vest in the Reorganized Debtor free and clear of all Liens, claims, interests, security interests and other encumbrances and without further order of the Bankruptcy Court except for Liens that are expressly retained and preserved by this Plan. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, and dispose of its Property and Assets free of any restriction of the Bankruptcy Code.

6.3  *Continuing Operations*.  The Reorganized Debtor shall, after the Confirmation Date, continue the operations of the Debtor. Pro forma financial statements showing the estimated future financial condition and results of operations of the Debtor are contained on Exhibit A.

6.4  *Company Action*.   The entry of the Confirmation Order shall constitute authorization for the Reorganized Debtor to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation. The management of the Reorganized Debtor is authorized and directed to do all things and to execute and deliver all agreement, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtor and Reorganized Debtor.

6.5  *Working Capital Facility*.  The Reorganized Debtor will enter into a working capital facility (the "**New Facility**") with Franklin Capital Holdings LLC ("**FCH**").  This New Facility will be evidenced by documents to be negotiated between FCH and the Reorganized Debtor.  The full execution of the New Facility documents shall be conditions precedent to the Effective Date.

The terms of the New Facility are summarized as follows:

The total line of credit under the Proposal is $1,800,000.

Under the New Facility, the Reorganized Debtor and FCH agree that to limit advances under the New Facility to no more than $1,000,000 during certain months of the year and to no more than $1,800,000 during certain other months of the year.  FCH's advances under the New Facility will be based upon the Reorganized Debtor's acceptable/eligible accounts receivable and an "Advance Rate" defined as 80% of the face amount of the "eligible invoices" or 75% of the face amount of Amazon invoices.  Interest and fees under the Proposal include: (i) a minimum

16

discount fee of one percent (1%) of the Purchase Price of each Advanced Account for the first thirty (30) day period or part thereof such Account remains unpaid, plus (ii) thirty-three hundredths percent (0.33%) of such gross amount of the Advanced Account(s) for each additional fifteen (15) day period or part thereof that each such Advanced Account remains unpaid plus (iii) five tenths percent (.5%) of the gross amount of Accounts that are not Advanced Accounts and (iv) interest on the aggregate outstanding Advances made by FCH to the Reorganized Debtor on the basis of prime rate of interest plus 1.5%.

Under the Proposal, the Reorganized Debtor will grant to FCH a first priority security interest in all of its assets, except the Reorganized Debtor's intellectual property.

To further secure payment of the New Facility, Robert Truax agrees to offer his personal guarantee of the New Facility.

6.6    *Issuance of Convertible Preferred Membership Interest*.  On the Effective Date, in exchange for the cumulative capital contributions of up to $750,000 (the "**Capital Contribution**") by an investor (the "***Investor***") to the Reorganized Debtor and the Reorganized Debtor will issue to the Investor "Convertible Preferred Membership Interests" in an amount commensurate with the Capital Contribution made by the Investor, which, after giving effect to the Capital Contribution, will result in an interest in Investor holding a fifty percent (50%) of the membership interests in the Reorganized Debtor (the "**Preferred Interest**").  In addition to the Preferred Interest, Robert Truax will be issued a forty-five percent (45%) non-preferred membership interest in the Reorganized Debtor and the remaining members of the Debtor will be issued, collectively, a five percent (5%) non-preferred membership interest in the Reorganized Debtor.  The Preferred Interest may convert 1:1 to non-preferred membership interests in the Reorganized Debtor.  The Investor shall vote together with the non-preferred membership interest holders on an as-converted basis, and not as a separate class, except as required by law or as provided under the "Protected Provisions" of the Reorganized Debtor's agreement to issue the Preferred Interest.

In addition, the Investor will lend to the Reorganized Debtor on an unsecured basis $200,000 and will accrue interest at the annual rate of 7.5% (the "**Investor Note**").  Under the terms of the Investor Note, the Reorganized Debtor will not make any payment to the Investor until New Fanatic's Note has been paid in full; and all debt under the Investor Note will be fully subordinated to any claims under the New Fanatics Note.

The "Protective Provisions" will include the following: So long as no less than 50% of the Preferred Units issued in the transaction are owned by the Investor, in addition to any other vote or approval required under the Assumed Operating Agreement, the Reorganized Debtor will not, without the written consent of the Investor, either directly or by amendment, merger, consolidation, recapitalization, reclassification, or otherwise: (i) amend, alter, or repeal any provision of the Assumed Operating Agreement; (ii) create or authorize the creation of or issue any other security convertible into or exercisable for any equity security or increase the authorized number of shares of Preferred Interest and/or non-preferred membership interests in the Reorganized Debtor; (iii) purchase or redeem or pay any dividend or make any distributions on any units prior to the Preferred Interest.

Additional protections and benefits to the Investor include:

      (i)      Except for tax distributions, all other distributions, including dividends, cash flow, recapitalization proceeds, and proceeds upon any sale, liquidation, dissolution or winding up of the Reorganized Debtor shall be paid as follows: first to pay the Investor Note and then Capital Contribution of the Investor for the Preferred Interest held by the Investor at the time of such distribution plus a preferred return thereon equal to 10% per annum and the balance, if any, to be distributed pro rata to holders of the non-preferred membership interests of the Reorganized Debtor.

      (ii)      A merger or consolidation (other than one in which the holders of the membership interests in the Reorganized Debtor will own a majority by voting power of the outstanding shares of the surviving or acquiring corporation) or a sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of the Reorganized Debtor will be treated as a liquidation event.

      (iii)      Investor shall have a right of first offer whereby any units proposed to be either i) sold by the Reorganized Debtor or ii) transferred by any holder of Reorganized Debtor (such unit holder(s) being hereinafter referred to as "*Seller*") must first be offered to the Investor.  Investor shall have 10 days from the date of such offer to enter into a binding agreement to purchase the offered units from Company or Seller, as the case may be. If the Investor does not enter into a binding agreement to purchase all of the offered units within such time, this right shall expire and the Company or Seller may proceed with a sale or transfer of such units on terms no more favorable than those offered to the Investor.

      (iv)      The Reorganized Debtor will be governed by a Board of Governors comprised of three (3) governors. So long as not less than 33% of the Preferred Units issued in the transaction are outstanding or the Investor has converted the Preferred Interest to non-preferred interests such that the Investor holds not less than 33% of its originally issued Preferred Interest, Investor shall have the right appoint one (1) governor, (ii) Robert Truax shall have the right to appoint one (1) governor, and (iii) such two appointed governor shall jointly select a third governor.

      (v)      Robert Truax and the Investor are also to enter into an agreement granting the Investor the right and option (the "**Truax Option**") to acquire from Robert Truax his 45% membership interest ("**Truax Interest**") in the Reorganized Debtor for $1 million (the "**Truax Option Price**").

To the fullest extent permitted under Section 1145 of the Bankruptcy Code, the issuance of the Preferred Interest and any non-preferred membership interests in the Reorganized Debtor under or in connection with the Plan shall be and is exempt from the registration requirements of the Securities Act of 1933, as amended, and any state or local law requiring registration for the offer or sale of a security or registration or licensing of any issuer of such securities.

Based upon Investor's Capital Contribution, the post Effective Date management of the Reorganized Debtor will be as follows:

Upon the occurrence of the Effective Date, the management, control, and operation of the Reorganized Debtor shall be the responsibility of the Holders of membership interests in the Reorganized Debtor as well as the following individual until and unless a successor is appointed in accordance with applicable law: Robert Truax as the Reorganized Debtor's chief executive officer. Pursuant to the terms of the Assumed Operating Agreement, there can be as many as five (5) governors on the board of governors of the Reorganized Debtor. Since the Redemption Agreement, Robert Truax has been the sole governor of the Debtor's board of governors. In connection with the transaction, described in Section 6.5 above, the Investor may designate one member of the three member board of governors of the Reorganized Debtor and Robert Truax will appoint the another governor. A third governor will be designated by agreement between Robert Truax and the Investor. Robert Truax will appoint himself as his designated governor; the Investor will appoint as its designated governor, Danny Kohanchi of Margolin Shoes and Apparel, a current customer of the Debtor. The third designated governor will initially be Jill O'Flanagan, who is an employee of the Debtor and has been the Debtor's Director of Business Development for many years.

6.7   *Continued Organizational Existence of Debtor*.   The Debtor shall continue to exist after the Effective Date as a separate entity, with all the powers available to such legal entity, in accordance with applicable laws.

6.8   *Post Effective Date Management*.   Upon the occurrence of the Effective Date, the management, control, and operation of the Reorganized Debtor shall be the responsibility of the Holders of membership interests in the Reorganized Debtor as well as the following individual until and unless a successor is appointed in accordance with applicable law: Robert Truax as the Reorganized Debtor's chief executive officer. Pursuant to the terms of the Assumed Operating Agreement, there can be as many as five (5) governors on the board of Governors of the Debtor. Through a series of resignations, there has been only one Governor since the Redemption Agreement and the subsequent increase in Robert Truax's membership interest in the Debtor. Since the Redemption Agreement, Robert Truax has been the sole governor of the Debtor's board of governors. In connection with the Capital Contribution by the Investor, described in Section 6.6 above, the Investor may designate one member of the three member board of governors of the Reorganized Debtor. Robert Truax will appoint another governor and the Investor and Robert Truax will together appoint a third governor. Robert Truax will appoint himself to be a governor; the Investor will appoint Danny Kohanchi to be a governor; and Robert Truax and the Investor will appoint as the third governor, Jill O'Flanagan, who is an employee of the Debtor and has been the Debtor's Director of Business Development for many years.

6.9   *Fanatics Settlement*.   The Plan shall constitute a settlement between the Debtor, Fanatics and FRG pursuant to Bankruptcy Rule 9019 on the following terms (the "Fanatics Settlement"), which settlement shall be approved and, subject to paragraph 6.9(g) hereof, effective on the date of entry of the Confirmation Order (the "Fanatics Settlement Effective Date") by the Bankruptcy Court pursuant to the Confirmation Order:

19

a.  The secured claim held by FRG shall be allowed in the amount of $2,800,000.00 and shall receive the treatment set forth herein (as defined above, the Allowed Class A2 Claim).

b.  The unsecured claim filed by Fanatics in relation to the Apparel Agreement shall be an allowed Class C unsecured claim in the amount of $356,572.56 (the "Allowed Fanatics Unsecured Claim").

c.  The Fanatics Release, as set forth in section 10.3 of this Plan, shall be approved and effective.  By operation of the Plan, on the Fanatics Settlement Effective Date, FRG and Fanatics shall be deemed to have released the Debtor pursuant to section 10.2 of this Plan from any and all claims other than the Allowed Class A2 Claim and the Allowed Fanatics Unsecured Claim, which shall each receive the treatment provided for such claims as set forth in this Plan.

d.  The parties shall execute the New Fanatics' Note and Security Agreement.

e.  The parties agree that the Apparel Agreement is terminated and that no additional amounts are owed to either party under the Apparel Agreement. Any inventory currently held by the Debtor that is subject to the Apparel Agreement shall, either (i) be returned by the Debtor to Fanatics or (ii) upon mutual agreement of the Debtor and Fanatics as to application of the proceeds, be sold by the Debtor.

f.  The parties shall dismiss the Adversary Proceedings with prejudice.

g.  Finally, it shall be a condition precedent to the effective date of the Fanatics Settlement that FRG and Fanatics, on the one hand, and Robert Truax, on the other, shall execute general, mutual releases of all claims other than claims going forward under Mr. Truax's guarantee of the New Fanatics' Note.

6.10 *Preservation of Rights of Action; Settlement.*  Except for the Adversary Proceedings, which are to be dismissed with prejudice as described in the Plan, and those claims released by the Debtor through the Fanatics Settlement, all rights, claims, Causes of Action, (including Avoidance Actions, which definition explicitly includes preference actions pursuant to 11 U.S.C. § 547), defenses, and counterclaims of or accruing to the Debtor or its Estate shall become assets of and vest in the Reorganized Debtor, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, claims, Causes of Action, defenses and counterclaims have been listed or referred to in the Plan, the Schedules, or any other document Filed with the Bankruptcy Court. The Reorganized Debtor does not waive, relinquish, or abandon (nor shall it be estopped or otherwise precluded from asserting) any right, claim, Cause of Action, defense, or counterclaim that constitutes property of the Estate: (a) whether or not such right, claim, Cause of Action, defense, or counterclaim has been listed or referred to in the Plan or the Schedules, or any other document Filed with the Bankruptcy Court; (b) whether or not such right, claim, Cause of Action, defense, or counterclaim is currently known to the Debtor; and (c) whether or not a defendant in any litigation relating to such right, claim, Cause of Action, defense or counterclaim filed a Proof of Claim in this Chapter 11 Case, filed a notice of appearance or any

20

other pleading or notice in this Chapter 11 Case, voted for or against the Plan, or received or retained any consideration under the Plan.

      6.11 *Cancellation of Existing Security Claims*.   Upon the full payment or other satisfaction of any Allowed Secured Claim, or promptly thereafter, the Holder of such Allowed Secured Claim shall deliver to the Debtor (or Reorganized Debtor after the Effective Date) any Collateral or other property of the Debtor and/or Reorganized Debtor held by such Holder, and any termination statements, instruments of satisfactions, or releases of all Liens or security interests with respect to its Allowed Secured Claim that may be reasonably required in order to terminate any related financing statements, deeds of trust, mortgages, mechanic's liens, or *lis pendens*.

## ARTICLE 7
## SUPERVISION OF THE PLAN

      7.1 *Jurisdiction*.   Until the Chapter 11 Case is closed and the Bankruptcy Court discharges the Debtor pursuant to section 1193 of the Bankruptcy Code, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction permissible, including without limitation, the jurisdiction necessary to ensure that the purposes and intent of this Plan are carried out and to hear and determine all claims and related objections that could have been brought before the entry of the Confirmation Order.

      7.2 *General Retention*.   Following confirmation of this Plan, the Bankruptcy Court shall also retain jurisdiction for the purposes of classifying any Claim, re-examining Claims that have been allowed for purposes of voting and determining such objections as may be filed with the court with respect to any Claim.   The failure by the Debtor to object to or examine any Claim for the purposes of voting shall not be deemed a waiver of the right of the Debtor or Reorganized Debtor, as appropriate, to object to or re-examine such claim, in whole or in part.

      7.3 *Specific Purposes*.   In addition to the foregoing, after confirmation of the Plan the Bankruptcy Court shall retain jurisdiction to the maximum extent legally permissible, including for the following specific purposes:

      (a)   To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, the allowance of Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to the facts and circumstances arising out of or relating to the Chapter 11 Case;

      (b)   To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

      (c)   To ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are accomplished as provided herein;

      (d)   To consider Claims and Equity Interests or the allowance, classification, priority, compromise, estimation, or payment of any Claim or Equity Interest;

(e)      To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is stayed, reversed, revoked, modified, or vacated for any reason;

(f)      To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to prevent interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)      To hear and determine any application to modify the Plan in accordance with section 1193 of the Bankruptcy Code, to remedy any defect or omission in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)      To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)      To hear any motion by Fanatics and/or FRG to convert this case to a proceeding under Chapter 7 of the Bankruptcy Code;

(j)      To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(k)      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and the Confirmation Order;

(l)      To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following the Effective Date;

(m)      To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(n)      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(o)      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(p)      To determine the scope of any discharge of the Debtor under the Plan or the Bankruptcy Code;

(q)      To recover all assets of the Debtor and all property of the Debtor's estate, wherever located;

22

(r)      To hear and determine any matters arising out of or related to confidentiality agreements entered into by the Debtor during the Chapter 11 Case;

(s)      To hear and determine any rights, claims or causes of action held by or accruing to the Debtor pursuant to the Bankruptcy Code, any other federal or state statute, or any legal theory;

(t)      To enter an Order discharging the Debtor under Section 1192 of the Bankruptcy Code;

(u)      To enter a final decree closing the Chapter 11 Case; and

(v)      To hear and determine any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE 8
## CLAIMS ADMINISTRATION

8.1      *Reservation of Rights to Object to Claims.* Unless a Claim is specifically allowed under the Plan or otherwise Allowed by order of this Court, the Debtor reserves any and all objections to any and all claims and motions or requests for the payment of Claims, whether administrative expense, secured, or unsecured, including without limitation any and all objections to the validity or amount of any and all alleged administrative expense claims, priority tax claims, liens, and security interests, whether under the Bankruptcy Code, or under other applicable law or contract.

8.2      *Filing of Objections.* Unless otherwise extended by the Court in the Confirmation Order, any objections to claims other than Administrative Claims must be properly filed and served within sixty (60) days after the later of (i) the Confirmation Date (unless such day is not a business day, in which case such deadline will be the next business day thereafter); or (ii) the date a proof of claim is filed.

8.3      *Determination of Claims*.  Except as otherwise agreed by the Debtor, any Claim as to which a proof of claim or motion or request for payment was timely filed in these cases can be determined and liquidated pursuant to (i) a Final Order of the Court, or (ii) a Final Determination under applicable non-bankruptcy law, and will be deemed in such liquidated amount and satisfied in accordance with this Plan. Nothing contained in the Plan or the Confirmation Order will constitute, or be deemed a waiver of, any claim, right, interest, or Cause of Action that the Debtor or the Debtor's estate can have against any person in connection with, or arising out of any claim or claims, including without limitation any rights under Section 157(b) of title 28 of the United States Code.

On and after the Effective Date, subject to Section 8.1(b), the Reorganized Debtor will have the authority to assert, compromise, settle, otherwise resolve, or withdraw any objections to Claims, and compromise, settle, or otherwise resolve any other form of contested Claims, without further approval of the Bankruptcy Court. If a counterparty in such matters requests a court order memorializing a compromise or settlement, however, the Debtor will undertake reasonable actions needed to secure one.

8.4   *Procedures for Contested Claims.*

(a)   No Distributions Pending Allowance.  Notwithstanding any other provision of this Plan, payments or distributions may be withheld only to the extent of the portion of a Claim that is a Contested Claim unless and until all objections to such Contested Claim have been settled or withdrawn or resolved by a Final Order, and the Contested Claim at issue has become an Allowed Claim.

(b)   Claim Estimation. The Debtor may request estimation or limitation of any Contested Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code; provided, however, that the Court will determine (i) whether such Contested Claim is subject to estimation pursuant to section 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any.  Unless provided otherwise in an order of the Court, the estimated amount shall constitute the Allowed amount of such Claim or a maximum limitation on such claim, as the Court may direct; provided, however, that if the estimate constitutes the maximum limitation on such claim, the Debtor may elect to pursue supplemental proceedings to object to the ultimate allowance of such Claim. The foregoing shall not limit the rights granted by Section 502(j) of the Bankruptcy Code.

(c)   No Distribution if Cause of Action Asserted.  Notwithstanding any other provision in this Plan, no payment or distribution will be made with respect to all or any portion of a Claim or Allowed Claim held by a claimant against whom a Cause of Action  has been timely asserted unless and until such Cause of Action has been settled or withdrawn or has been determined by Final Order.

(d)   Reserve for Contested Claims.  From and after the Effective Date and until such time as all Contested Claims have been compromised and settled or determined by Final Order of Final Determination, at or before the time of the first distribution to creditors under this Plan, the Debtor shall establish and maintain a separate reserve account in an amount equal to distributions that would have been made to the holders of Contested Claims if each Contested Claim were an Allowed claim equal to the lesser of (i) the Contested Claim amount, (ii) the amount in which the Contested Claim is estimated by the Court for purposes of allowance, which amount unless otherwise ordered shall constitute the maximum amount in which the Contested Claim may become an Allowed Claim, or (iii) such other amount as may be agreed upon by the Debtor and the holder of the Contested Claim.

(e)   Payment upon Allowance or Disallowance.  At such time as a Contested Claim becomes, in whole or in part, an Allowed Claim, the Debtor shall distribute to the holder thereof the distribution(s) to which the holder is then entitled under the Plan. Such distribution(s), if any, shall be made as soon as practicable after the Contested Claim becomes, in whole or in part, an Allowed Claim whether by court order or by other means as set forth in Section 8.1(b), above.

(f)   No Post-Confirmation Claim Transfers.  The Record Date for any claim transfers shall be the Confirmation Date. Payments under the Plan will be mailed to the address of the holder of the Allowed Claim as of the Record Date until the holder of the Allowed Claim as of the Record Date notifies the appropriate Debtor or Reorganized Debtor, as appropriate, in writing of a different address.

24

(g)    Unclaimed Payments.  In the event a payment is returned to the Reorganized Debtor unclaimed, with no indication of the payee's forwarding address, the Reorganized Debtor will hold such payment for a period of two months from the date of return. If the payment is not claimed by the payee by the end of that period, the payment will be held by the relevant Reorganized Debtor to fund the next distribution to its holders of Allowed Claims.

(h)    Untimely Proofs of Claim.  Except as otherwise ordered by the Bankruptcy Court, if a proof of a claim is required under Bankruptcy Rule 3003 and is not timely filed according to the provisions of the Bankruptcy Code or applicable Final Order in this Chapter 11 Case, the holder of such claim will not be treated as a creditor for purposes of distribution under this Plan and will receive no distribution under this Plan on account of such claim.

## ARTICLE 9
## PROVISIONS GOVERNING DISTRIBUTIONS

9.1    *Date of Distributions.*  Distributions shall be made as set forth in the subsections addressing the treatment of the various classes of claims.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business day, but shall be deemed to have been completed as of the required date.

9.2    *Disbursing Agents.*  Except for distributions under the Plan to the Holders of Allowed Class C Claims, which shall be made by the Sub V Trustee, all other distributions under the Plan shall be made by the Reorganized Debtor. The Reorganized Debtor and the Sub V Trustee, as applicable, shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its respective duties under the Plan, (b) make the distributions contemplated hereby, and (c) exercise such other powers as may be necessary and proper to implement the provisions hereof.

From and after the Effective Date, the Sub V Trustee, pursuant to Section 1194 of the Bankruptcy Code shall collect Disposable Income from the Reorganized Debtor and make distributions to the holders of Allowed Class C claims.  The Sub V Trustee shall be entitled to reasonable fees and expenses incurred in connection with her duties described in this section; the fees and costs incurred by the Sub V Trustee shall be paid from the amounts distributable to Allowed Class C Claims as provided under Section 4.4 of the Plan.

Notwithstanding anything to the contrary herein, in the event that the Plan is confirmed by the Court as a consensual plan of reorganization, the Debtor will be responsible for (i) distributing Disposable Income to the holders of Allowed Class C Claims and (ii) pending the resolution of the Adversary Proceeding, holding the Reserved Payments under the New Fanatics' Note and, accordingly, the Sub V Trustee will be relieved of any obligation under the Plan to make these distributions or holding any Reserved Payments.

9.3    *Delivery of Distributions.*

(a)    General.  Subject to Bankruptcy Rule 9010, all distributions to a Holder of an Allowed Claim or Allowed Equity Interest shall be made to the address of the Holder thereof

as set forth (i) on such Holder's Proof of Claim, or if no Proof of Claim has been filed, (ii) on the Schedules filed with the Bankruptcy Court, (iii) on the books and records of the Debtor or its agents, or (iv) in a letter of transmittal by such Holder, unless the Debtor or Reorganized Debtor or Sub V Trustee has been notified in writing of a change of address.

(b)     <u>Withholding and Reporting Requirements</u>.  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

9.4     *Unclaimed Distributions*.  In the event that any distribution to any Holder is returned as undeliverable, the Reorganized Debtor or the Sub V Trustee, as applicable, shall use reasonable efforts to determine the current address of such Holder, but no distribution to such Holder shall be made unless and until the Reorganized Debtor or the Sub V Trustee, as applicable, has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest from the original distribution date through the new distribution date; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the delivery thereof. After such date, all unclaimed property shall revert to the Reorganized Debtor, and the Claim of any other Entity to such property or interest in property shall be discharged and forever barred.

9.5     *Manner of Payment*.  At the option of the Reorganized Debtor or the Sub V Trustee, as applicable, any Cash payment to be made hereunder may be made by a check, wire transfer, or any other lawful means.

**ARTICLE 10**
**DISCHARGE, RELEASE AND INJUNCTION**

10.1     *Discharge of Claims and Termination of Interests*.  Pursuant to section 1192 of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract instrument, or other agreement or document created pursuant to the Plan or section 1192, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Discharge Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services

26

performed by employees of the Debtor before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtor with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

10.2 *Releases by Releasing Parties*. Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Discharge Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Debtor and the Reorganized Debtor (collectively, the "Released Parties") is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each of the Entities that have held, hold, or may hold Claims or Interests that have been released or discharged pursuant to the Plan (collectively, the "Releasing Parties") from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that each Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the Debtor's capital structure, management, ownership, or operation thereof), the Debtor's in or out of court restructuring efforts, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Plan (including, for the avoidance of doubt, the plan supplement), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing. Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed by the Reorganized Debtor to implement the Plan, (ii) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (iii) the rights of any current employee of the Debtor under any employment agreement or plan, (iv) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, or (v) the rights of Holders.

10.3 *Release of Fanatics and FRG*. Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the FRG Settlement Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of Fanatics and FRG (collectively, the "Fanatics Released Parties") is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by the Debtor (collectively, the "Fanatics Releasing Parties") from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that each Fanatics Releasing Party is, would be, or would have

been legally entitled to assert (whether individually or collectively) against the Fanatics Released Parties.

10.4 *Injunction*. Except as otherwise expressly provided in the Plan or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan, discharged pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, or the Reorganized Debtor: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

## ARTICLE 11
## PLAN CONFIRMATION AND EFFECTIVE DATE

11.1 *Conditions Precedent to Effective Date*. The following are conditions precedent to the occurrence of the Effective Date: (i) the Confirmation Order shall have been entered by the Bankruptcy Court, be in full force and effect, and not subject to any stay or injunction; (ii) payment of the Capital Contribution; (iii) full execution of documents evidencing the New Facility, the Investor's Note; the Reorganized Debtor's transfer to the Investor of the Preferred Interest; (iv) full execution of the New Fanatics' Note and the New Fanatics' Security Agreement by FRG, the Reorganized Debtor and Robert Truax, (v) the execution of the Subordination Agreement by FRG and FCH, (vi) FRG's release of Robert Truax and dismissal of the Guaranty Litigation, (vii) the occurrence of the Fanatic's Settlement Effective Date, and (viii) FRG and Fanatics' withdrawal of their motion to convert.

11.2 *Notice of Effective Date*. Within three (3) days after the occurrence of the Effective Date, the Reorganized Debtor shall file and serve on all creditors and parties-in-interest a notice of the occurrence of the Effective Date.

11.3 *Cramdown*. The Debtor requests confirmation under Section 1191(b) of the Bankruptcy Code with respect to any impaired class that has not accepted, or is deemed not to have accepted this Plan.

# ARTICLE 12
# MISCELLANEOUS

12.1 *Time of the Essence*.  All payments required to be made pursuant to this Plan shall be made in a timely fashion.

12.2 *Retention of Claims and Rights of Action*.  Except as otherwise provided in the Plan, the Debtor expressly reserves all claims and Causes of Action against any creditor or other entity and the right to pursue the same.

12.3 *Amendments or Modifications of the Plan*.   Alterations, amendments, or modifications of or to the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of section 1193(a) of the Bankruptcy Code. After the Confirmation Date, so long as such action comports with section 1193(b) or 1193(c), the Debtor or the Reorganized Debtor may modify the Plan including instituting proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan. In addition, as provided under section 1193(d) of the Bankruptcy Code, a Holder of a Claim or Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the plan as modified, unless, within the time fixed by the court, such holder changes the previous acceptance or rejection of the holder.

12.4 *Exhibits/Schedules*.   All exhibits and schedules to the Plan, if any, are incorporated into and are a part of the Plan as if set forth in full herein.

12.5 *Event of Default*.  Unless otherwise provided elsewhere in this Plan, default with respect to, as appropriate, the Debtor's or Reorganized Debtor's obligations under the Plan to any creditor or other party in interest will not occur unless and until such creditor or party in interest has delivered written notice of such default to the Debtor or Reorganized Debtor, as appropriate, at the address set forth below and the Debtor or Reorganized Debtor has failed to cure such default within 30 days after receipt of such written notice:

> The Comet Clothing Company LLC
> Attn: Jill O'Flanagan
> The Comet Clothing Co.
> 6117 Blue Circle Drive, Suite 100
> Minnetonka, MN 55343

For the avoidance of doubt, any default, and notice of any such default, under the New Fanatics Note shall be governed by the terms of the New Fanatics Note and section 4.2 of the Plan, and not this section 12.5 of the Plan.

[*Signature Page Follows*]

29

IN WITNESS WHEREOF, the Debtor has executed this Second Plan of Reorganization as of the 9th day of March, 2021.

Respectfully Submitted,

**The Comet Clothing Company , LLC**

*/s/ Robert Truax*

By:  Robert Truax
Its:  Chief Executive Officer

# EXHIBIT A
[*Placeholder for New Fanatics Note*]

# EXHIBIT B
*[Placeholder for Subordination Agreement]*